UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------X

ANDREW RUSSO

      Movant,               <u>MEMORANDUM AND ORDER</u>

  - against -           Civil Action No.
                         04-CV-3871(DGT)

UNITED STATES OF AMERICA

      Respondent.

-----------------------------X

Trager, J.:


    On January 26, 1999, following a jury trial, movant Andrew
Russo ("movant") and his co-defendant Dennis Hickey were
convicted on counts one, two and four of their indictment:  for
endeavoring to impede the due administration of justice, a
violation of 18 U.S.C. § 1503; for conspiracy to do the same, a
violation of 18 U.S.C. § 371; and for attempting to corruptly
persuade another person, with the intent to delay communication
to the FBI of information relating to the possible commission of
a federal offense, a violation of 18 U.S.C. § 1512(b)(3).  On
August 2, 1999, movant's conviction on count three of his
indictment was dismissed.  It charged him with an obstruction of
justice violation, pursuant to 18 U.S.C. § 1503, based on <u>United</u>

States v. Masterpol, 940 F.2d 760 (2d Cir. 1991).[1]  On August 3,
1999, movant was sentenced to fifty-seven months' imprisonment to
be followed by three years of supervised release and a $150
special assessment.  Movant's appeal was denied.  United States
v. Russo, 302 F.3d 37 (2d Cir. 2002).

On September 9, 2004, movant filed a motion pursuant to 28
U.S.C. § 2255.[2]  He filed a supplemental memorandum of law on
December 21, 2004.  In his supplemental memorandum, movant argues
six points that he believes should result in a reversal of his
conviction.  See generally Pet.'s Supp. Mem. ("Supp. Br.").  His
first claim is that the government failed to provide evidence to
the defense that their key witness, Dorothy Fiorenza, was
suffering from bipolar disorder, which constituted a violation of
Brady v. Maryland, 373 U.S. 83 (1963).  Supp. Br. 1-11.  His
second claim is that Fiorenza's diagnosis, as well as taped
conversations between Fiorenza and her husband, are newly
discovered evidence which warrant a new trial.  Supp. Br. 12-13.

---

[1] In Masterpol, the Second Circuit held that witness
tampering does not fall within the obstruction of justice clause
of § 1503.  The dismissal of count three of movant's indictment
resulted in government witness Dorothy Fiorenza having to switch
her guilty plea from obstruction of justice to witness tampering.

[2] The mandate on movant's appeal was issued on November 27,
2002.  Although the present motion was filed on September 9,
2004, more than one year after the conviction, it is not time-
barred since it was due to a mix-up in the Clerk's Office and not
the fault of the defendant.  The motion was originally filed on
November 18, 2003 and has a filing stamp by the U.S. Attorney's
office to that effect.

Movant's third claim is that he received ineffective assistance of counsel when his defense counsel decided not to call Theresa Castranova, a girlfriend of his son, as a witness. Supp. Br. 14-19. Movant's fourth claim is that in Fiorenza's testimony, she deliberately misrepresented her cooperation agreement with the government, resulting in perjury. Supp. Br. 20-27. Movant's fifth claim is that the court's failure to properly voir dire the jury and to declare a mistrial denied him a fair trial. Supp. Br. 28-37. Movant's final claim is that the federal guidelines under which he was sentenced are unconstitutional. Supp. Br. 38-39. For the following reasons, the motion is denied.

## Background

Movant's conviction stemmed out of efforts to tamper with an anonymous juror in a 1994 trial of his son Joseph Russo ("JoJo") and several other Colombo family defendants in the Eastern District of New York for racketeering murder and other offenses. United States v. Persico, No. 92-CR-351. Theresa Castranova, JoJo's girlfriend at the time of his trial, had gone to school with one of the jurors, recognized her in court and provided the juror's name to movant. When the government learned that a juror's mother had been approached by an investigator working for movant, movant and his associate and later co-defendant Dennis Hickey helped hide Castranova so that she could not be found by

the FBI and served with a grand jury subpoena.  As a result, the
investigation was closed.

### (1)

In early 1994, movant's son JoJo and several other Colombo
family members were on trial for murder and murder conspiracy
before Judge Charles P. Sifton in the Eastern District of New
York (the "Persico" case).  <u>United States v. Persico</u>, No. 92-CR-
351.  The Persico jury was anonymous, in accordance with Judge
Sifton's orders.  When the Persico trial began, movant was
incarcerated, Tr. 1352, but was still very involved in the
decision-making of his son's legal team.  Tr. 1356.  JoJo
required his father's approval of all trial strategy decisions.
Tr. 1368.  Upon his release, movant continued his involvement, as
evidenced by transcripts of prison telephone conversations
between movant and his son in which he demanded to read every
piece of paper in JoJo's case.  Tr. 1356, 1368.

Regina Wyman was an alternate juror in the Persico trial.
Tr. 648.  During the trial, Theresa Castranova, JoJo's
girlfriend, recognized Wyman, a former schoolmate of hers, in the
courtroom.  Tr. 655-57.  After the Persico convictions, a private
investigator, Nicholas Vasile, went to  Wyman's mother's home,
looking for Wyman.  Tr. 648-49.  She refused to provide Vasile
with Wyman's address and immediately contacted Wyman, who in turn

contacted Judge Sifton. Tr. 649-50.

In May 1994, an FBI investigation began, Tr. 603, and a grand jury was convened. Tr. 610. Vasile admitted to contacting Wyman's mother, but stated that he obtained Wyman's name from a man whose name Vasile did not know. Tr. 604-05. A grand jury subpoena was issued for Castranova. Tr. 611. After a year of unsuccessfully searching for her, the investigation was placed in a pending inactive status. Tr. 617-19. The file was closed in February 1996. Tr. 619.

In 1998, Dorothy Fiorenza approached the government to cooperate in testifying against movant. She agreed to plead guilty to a violation of 18 U.S.C. § 1503 in exchange for the government helping herself and her husband, Larry Fiorenza - who had been convicted along with JoJo - receive lesser sentences. Tr. 814. Her testimony included information about movant and Hickey's hiding away of Castranova as well as her conversations with movant regarding his efforts to contact the juror.

Fiorenza, who was movant's mistress in early 1995, was a key witness for the government at movant's trial. She was also an attorney. Fiorenza testified that as part of her cooperation agreement, the government agreed to write a letter to her husband's sentencing judge notifying him of her cooperation and asking him to reduce her husband's sentence. Tr. 792. She also testified that, based on her guilty plea to § 1503, she would

face automatic disbarment.  Tr. 790.

Fiorenza testified that during the time she and movant were together, movant was living at Dennis Hickey's Crane's Neck estate.  Tr. 684-85.  She further testified that a Persico trial transcript, which included the court's order prohibiting any effort to contact a juror, was found in the estate.  Tr. 1619. According to Fiorenza, upon movant's request, she began to visit JoJo in prison and pass coded messages between them.  Tr. 689, 694-95.  During these conversations, JoJo asked what was going on with "Nick V." and "Dick Tracy" - references to Nick Vasile.  Tr. 696.

In late January 1995, movant took Fiorenza to Hickey's farm, where she first met Castranova.  Tr. 698-701.  Fiorenza testified that movant explained to her that Castranova was staying on the farm to avoid a subpoena.  Tr. 699, 741.  Castranova told Fiorenza that she had been seeing JoJo prior to his going to prison.  Tr. 708.  She added that movant instructed her not to use her real name but rather to use code names, such as "Lauri," "the Brat" and "Frankie."  Tr. 701, 703.  These code names are used throughout transcripts of prison conversations between movant and JoJo to refer to Castranova.  Fiorenza testified that movant furnished Castranova with a Mercury Cougar and a Jeep, Tr. 766-67, while Hickey sent new appliances to his farm for her use. Tr. 703.  In addition, Hickey gave Castranova $5,000 for her

birthday and gave her son money as well.  Tr. 758.

According to Fiorenza, after the first meeting, movant, Fiorenza and Castranova began to spend a lot of time together. Tr. 704.  Between January and April 1995, Fiorenza and Castranova saw each other at least once a week.  Tr. 743.  Castranova told Fiorenza that she was staying at Hickey's farm to avoid a grand jury subpoena because she had attended JoJo's trial and recognized one of the jurors.  Tr. 708-09.  Castranova then provided the juror's name to movant and explained that an investigator had been sent to contact the juror.  Tr. 708-09. Because Castranova was scared to visit JoJo in person, she sent letters for Fiorenza to deliver to JoJo.  Tr. 750-51.  After reading a letter, JoJo would rip it up and Fiorenza was instructed to dispose of it.  Tr. 751.  However, she kept some of them and eventually turned them over to the government.  Tr. 752-53.

On April 29, 1995, Fiorenza videotaped Castranova and her son on Hickey's farm.  Tr. 767-68.  Fiorenza testified that on the following day, movant's probation officer made a surprise visit to the farm and Castranova immediately ran upstairs and hid under a bed.  Tr. 772.  In May 1995, movant allowed Castranova to visit JoJo in prison, as by that time the grand jury investigation had ended.  Tr. 777.

Fiorenza's testimony was corroborated by other witnesses,

numerous transcripts of prison conversations between movant, JoJo and Hickey, letters between Castranova and the Russos and videotape evidence of movant with Castranova. For example, during a search of Hickey's estate, the FBI discovered that movant had Vasile's name and home phone number underlined in his phone book. Tr. 1620.

The defendants' case consisted principally of an attack on Fiorenza's credibility. Tr. 1697. Fiorenza testified that she had been suffering from anxiety and sleeplessness for a few years and was under the care of a doctor. Tr. 911. The doctor prescribed Buspar to treat the anxiety. Tr. 911. Defense counsel referred to Fiorenza as "a hysterical troubled young woman," Tr. 1715; "paranoid," Tr. 1714; a "fool," Tr. 1721; an "idiot," Tr. 1722; and a "trained seal," Tr. 1705. They explained to the jury that Fiorenza was motivated to testify by a desire to try to get her husband out of jail. Tr. 1707.

### (2)

At some point during the three days of jury deliberation, Juror Number Nine sent a note describing her fears that she recognized a person in the courtroom and that some addresses in movant's phone book were close to her home address. Tr. 1934-42. Unfortunately, these concerns were also expressed to the deputy clerk in the presence of other jurors while the deputy clerk was

delivering lunch.  Tr. 1945-47.  The deputy clerk testified as to
what occurred and noted that the other jurors expressed the view
that Juror Number Nine was simply trying to avoid deliberating
further.  Tr. 1945-47.  Juror Number Nine was questioned in the
presence of counsel.  Tr. 1936-38.  The defendants then moved for
a mistrial, which the court was prepared to grant but allowed the
defendants an opportunity to rethink their motion.  Tr. 1947-50.
The court reminded the defendants of some mistakes the government
had made in the case and of a recent acquittal in a similar case.
Tr. 1949-50.  The defendants withdrew their motion.  Tr. 1950.
Subsequently, Juror Number Nine was excused and, at the
suggestion of the defense counsel, it was explained to the
remaining jurors that Juror Number Nine had been worried about
missing a vacation she had planned.  Tr. 1952.  The jurors were
then instructed to individually write a note as to whether any of
Juror Number Nine's concerns affected them.  Tr. 1952-53.  Each
juror returned the note indicated they were not affected and
could continue deliberating.  Tr. 1953-54.  They ultimately voted
to convict.


### (3)

   More than two years after the trial, in March 2001, Fiorenza
had a hearing in front of the Grievance Committee relating to her
law license.  <u>Grievance Committee for the Second and Eleventh</u>

9

<u>Judicial Circuits v. Fiorenza</u> (Mar. 21, 2001) Transcript ("Grev. Tr.").  During that hearing, it was revealed that in October 1999, Fiorenza was seeing a non-psychiatric therapist who, upon observing that Fiorenza was becoming very upset and suicidal, referred her to a psychiatrist.  Psychiatric Report to the Federal District Court on Jane Doe, June, 2000 ("Psych. Rep.") p.4.  The psychiatrist diagnosed Fiorenza with bipolar disorder. Psych. Rep. at 5.

Also, subsequent to trial, the government handed over to the defense recorded telephone conversations between Fiorenza and her husband in which they discussed what they would do when Larry Fiorenza was released from prison.

## Discussion

### (1)

### Brady Material

Movant claims that the government violated the requirements of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by not providing the defense evidence of Fiorenza's bipolar disorder.  Supp. Br. 4. There are three components of a <u>Brady</u> violation:  "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  <u>Strickler v. Greene</u>, 527 U.S.

263, 281-82 (1999); see also DiSimone v. Phillips, 461 F.3d 181, 192 (2d Cir. 2006). The information must also have been material. See DiSimone, 461 F.3d at 196. "Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" United States v. Payne, 63 F.3d 1200, 1209 (2d Cir. 1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995).

It was disclosed at trial that Fiorenza had been seeing a doctor and was taking Buspar, an anti-anxiety medication. Tr. 911. According to the June 2000 psychiatrist's report, Fiorenza had begun to experience serious symptoms of a mental illness in October 1999, ten months after trial. Psych. Rep. at 4-5. In October 1999, the psychiatrist diagnosed her with bipolar disorder with symptoms of an obsessive compulsive disorder and posts-traumatic stress disorder. Psych. Rep. at 4-5. Thus, there is no evidence that the mental illness, relied upon by movant, had developed at the time of trial. Even if it had developed, there were not enough symptoms for even her personal doctor to diagnose the disease. Therefore, there was no

suppression on the part of the government, because at the time of trial, the government did not possess evidence of Fiorenza's mental illness.

In addition, the government is not obligated to provide evidence about a witness "if the defendant either knew . . . or should have known . . . of the essential facts permitting him to take advantage of any exculpatory evidence." United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982); see also United States v. Zackson, 6 F.3d 911, 918 (2d Cir. 1993). As Fiorenza was his former mistress, movant was "on notice" of Fiorenza's emotional state. See Leroy, 687 F.2d at 618. His defense launched a vigorous attack against Fiorenza's credibility, much of which centered on her apparent mental instability. The additional information about a possible mental disease that had yet to be diagnosed would only have been cumulative of evidence already available and used by movant. Therefore, even if this evidence had been Brady material, in corroboration with the other evidence - the taped conversations between the Russos, Castranova's letters, and the videotapes - the error did not prejudice movant.

## (2)

### Newly discovered evidence

Movant claims that the subsequent discovery of a) Fiorenza's bipolar disorder and b) taped conversations between Fiorenza and

her husband are newly discovered evidence and should allow for the granting of a new trial.  Supp. Br. 12.

### a. Fiorenza's Bipolar Disorder

A motion for a new trial based on newly discovered evidence should be "granted only with great caution . . . in the most extraordinary circumstances."  United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995 (quoting United States v. DiPaolo, 835 F.2d 46, 49 (2d Cir. 1987) (internal quotations and emphasis omitted)).  "Such relief should be granted only if the evidence is material to the verdict, could not with due diligence have been discovered before or during the trial, and is not cumulative."  See Sasso, 59 F.3d at 350; see also United States v. White, 972 F.2d 16, 20-21 (2d Cir. 1992).  The mental disease had not been diagnosed at the time of trial, see Psych. Rep. at 4-5, and may have not even existed - at least in the same degree of severity as when it was diagnosed; therefore, it is not newly discovered evidence.  Even if the later diagnosis had some bearing on Fiorenza's mental state at the time of trial, evidence of the diagnosis would have been clearly cumulative of the movant's attack against Fiorenza's mental stability as evidenced by the terms movant's counsel used in describing her.  See White, 972 F.2d at 21.  Especially in light of the corroborating evidence, evidence of Fiorenza's later-diagnosed mental illness

would not have produced a different result.  See id. at 22.

**b. The Larry Fiorenza tapes**

After the trial ended, the government provided tape-recorded conversations that Fiorenza had with her imprisoned husband. Movant claims that these conversations should be considered newly discovered evidence which could have impeached Fiorenza's testimony.  In these tapes, Larry Fiorenza discusses his associates in organized crime.  Movant claims that this indicates that Fiorenza was planning on writing a book and, therefore, had an economic incentive to testify.  This assertion is speculative to say the least, especially in light of the fact that now, more than eight years after the trial, no book has been published.  In addition, movant asserts that the conversations on the tapes would have been additional evidence of Fiorenza's emotional instability.  However, as discussed above, as the jury convicted movant despite his assault on Fiorenza's credibility and mental status - movant referred to Fiorenza as "hysterical," "paranoid," a "fool," an "idiot," and a "trained seal" - this additional evidence would not have impeached Fiorenza nor produced a different result.[3]  See White, 972 F.2d at 22.

---

[3] Indeed, it is possible that the tapes would only have further confirmed movant's role in organized crime.

14

## Ineffective assistance of counsel

To prevail on a claim of ineffective assistance of counsel, a movant must show that despite a strong presumption of reasonableness, defense counsel's conduct fell below an "objective standard of reasonableness" and that he was prejudiced as a result.  See Strickland v. Washington, 466 U.S. 668, 693-94 (1984); United States v. Vegas, 27 F.3d 773, 777 (2d Cir. 1994). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  Movant claims that the failure to call Theresa Castranova as a witness satisfies this standard.

Strategic choices of counsel are "virtually unchallengeable" and must be "viewed as of the time of counsel's conduct."  Id. at 690-91.  The decision to call or not call a witness is a strategic choice of counsel "which courts will practically never second-guess."  See United States ex. rel. Walker v. Henderson, 492 F.2d 1311, 1314 (2d Cir. 1974); see also Huggins v. Girdick, No. 03 CV 3248, 2007 WL 433397, at *17 (E.D.N.Y. Feb. 7, 2007).  Despite movant's assertion that Castranova would have testified that she hid from the FBI for other reasons and not because movant had instructed her to, her credibility would have inevitably been viewed with suspicion in

light of the wealth of evidence to the contrary.  Fiorenza's testimony, Castranova's letters to JoJo signed in her code names and the taped conversations between movant and JoJo which discussed Castranova's hiding from the FBI would have been enough to impeach her.  Even if counsel's failure to call Castranova was an error, there is no reason to believe the result would have been different if he had called her; therefore, this claim fails the <u>Strickland</u> test.

## (4)

### Perjury

Movant claims that Fiorenza's testimony with regard to (a) the consequences of her guilty plea and (b) the aid which the government agreed to provide in exchange for her testimony was false and misleading.  This claim is unavailing.

### a. The consequences of her guilty plea

At trial, Fiorenza testified that in her cooperation agreement, she pled guilty to an obstruction of justice charge, which would result in automatic disbarment.  Tr. 790.  After trial, however, the government vacated her guilty plea to obstruction of justice and instead she pled guilty to witness tampering, which did not result in automatic disbarment.  This change of plea was a result of the court ruling in movant's favor

on count three of his indictment, which charged an obstruction of justice violation. The defense argued, based on <u>United States v. Masterpol</u>, 940 F.2d 760 (2d Cir. 1991), that the enactment of § 1512, witness tampering, precluded the government from charging movant under § 1503, obstruction of justice. Due to the post-verdict ruling in movant's favor, Fiorenza's guilty plea was ultimately changed to a charge of witness tampering. Grev. Tr. 76.

"When . . . newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury." <u>White</u>, 972 F.2d at 20. In addition, the controlling issue is what "effect the evidence would have had on the jury's verdict had it been submitted at this trial." <u>Id.</u> at 21. Because the change of plea happened after the movant's trial as a result of a motion made by movant, Fiorenza's testimony was accurate at the time it was made: at trial she did face automatic disbarment. Moreover, in light of the evidence against movant, the jury's verdict would not have changed as a result of this new information. Therefore, in this regard, Fiorenza's testimony regarding automatic disbarment did not constitute perjury.

**b. The aid promised by the government**

Fiorenza testified that, as part of her cooperation

17

agreement, the government agreed to file a Rule 35 motion, which would advise Larry Fiorenza's sentencing judge of Fiorenza's cooperation and ask that it be applied to Larry Fiorenza's benefit.[4]  The sentencing judge ultimately reduced Larry Fiorenza's sentence to time served and he was released from prison.  Although Fiorenza testified that the Rule 35 motion had already been sent and she expected nothing additional from the government, she made it clear that the sentencing judge could not act upon the motion until movant's trial ended.  Tr. 793.

Movant claims that Fiorenza testified falsely since she had the incentive of reducing her husband's sentence.  In addition, recorded in the tapes that movant's counsel received after trial, Fiorenza and her husband, Larry, discuss what they will do when Larry is out of prison, indicating that Fiorenza knew that he would be released.  However, in Fiorenza's testimony, she made it clear that she was not promised that her husband's sentence would be reduced but rather that only his sentencing judge would make that decision.  Also, she stated unequivocally that she hoped, as his wife, for that result.  The conversations on the tapes were nothing more than a manifestation of their hopes.  The jury heard and understood Fiorenza's hope for her husband's sentence to be reduced and still voted to convict movant.  Therefore, there is

---

[4] At the time of trial, Larry Fiorenza was suffering from AIDS and doctors said he would not live more than another year or two.

no reason to believe that Fiorenza misrepresented her agreement with the government.  Therefore, this claim is without merit.

### (5)

### Movant's motion for a mistrial

Movant claims that the court failed to properly voir dire the jurors after Juror Number Nine was dismissed for fear that she recognized someone in the courtroom and that addresses in movant's phone book were close to where she lived.  Movant argues that the court should have questioned the jurors generally about the prejudicial effect that the emphasis on organized crime during the trial had on the jury's view of the movant.  Supp. Br. 37.  Instead the court's voir dire was limited to whether the jurors were affected by Juror Number Nine's statements.  Supp. Br. 37.  In movant's direct appeal, the Second Circuit ruled that evidence of organized crime was properly admitted because it was critical to proof of the crimes charged.  See United States v. Russo, 302 F.3d 37, 43 (2d Cir. 2002).  Therefore, the jurors clearly were aware of movant's connection to organized crime.

The court instructed each juror to write a note to the court indicating whether they were affected by Juror Number Nine's statements, to which they each responded that they were not.  Tr. 1953.  Given the jurors' unanimous response that they were not affected, the court was not required to grant a mistrial.  See

United States v. Bufalino, 576 F.2d 446, 450-52 (2d Cir. 1978) (holding that the denial of a mistrial was justified where spectators tried to start conversations with the jurors and there were suggested attempts at jury intimidation, but the jury declared they were not affected).

In addition, movant did not object to the voir dire at that time or on direct appeal and therefore waived his right to object. Id. at 451. It is generally accepted that, under section 2255, "[a] federal defendant seeking collateral relief despite procedural defaults" - in the present case, failure to object to trial errors at trial or on appeal - "must demonstrate 'cause' excusing his defaults and 'actual prejudice' resulting therefrom." Campino v. United States, 968 F.2d 187, 190 (2d Cir. 1992) (quoting Fiumara v. United States, 727 F.2d 209, 213 (2d Cir. 1984). Movant has not shown cause for his failure to object at trial or on direct appeal.

Movant also contends that "the court abandoned its role as a neutral and impartial jurist, and openly urged the defendants to withdraw their motion [requesting a mistrial]." Supp. Br. 36. To avoid the necessity of a retrial, I stated that I was prepared to grant a mistrial but suggested based on defense counsel's experience as well as the government's mistakes in this trial that a mistrial was not necessarily in their clients' interest. Tr. 1949. Rather, I suggested that they should discuss the

matter with their clients, pointing out that on a retrial the
government would be in a position to correct their mistakes.  Tr.
1949.  This issue should have been argued on direct appeal as
well, and it was not.  Movant has not shown any cause for his
failure to object at trial or on direct appeal, nor any prejudice
resulting therefrom.  Therefore, this claim is barred.


### (6)

### Federal Sentencing Guidelines

Movant claims that several enhancements were imposed to his
sentence and, therefore, his "sentence is unconstitutional, both
by virtue of the Guidelines being unconstitutional and as the
Guidelines were applied to his sentence." Supp. Br. 39.  The
Supreme Court ruled in United States v. Booker, 543 U.S. 220
(2005), that the Federal Sentencing Guidelines "violated the
Sixth Amendment to the extent that they allowed the maximum
sentence authorized by a guilty plea or a verdict to be increased
based upon findings of fact (other than the fact of a prior
conviction) made by the judge."  Guzman v. United States, 404
F.3d 139, 141 (2d Cir. 2005).  After Booker, the Guidelines are
only advisory. See id.

The Second Circuit analyzed Booker through the analysis set
forth in Teaque v. Lane, 489 U.S. 288 (1989) and ruled that
Booker does not apply retroactively on collateral review.  See

<u>Guzman</u>, 404 F.3d at 141-44.  The <u>Guzman</u> court stated that "a new rule of constitutional law does not apply retroactively to cases on collateral review unless the rule is substantive or a watershed rule of procedure that affects the fundamental fairness and accuracy of the criminal proceeding." <u>Id.</u> at 141 (internal quotations and citations omitted).  Since movant's case was prior to <u>Booker</u>, the ruling in <u>Booker</u> has no application to movant's case.  Therefore, this claim is rejected.

## Conclusion

For the reasons set forth above, the motion is denied.


Dated:     Brooklyn, New York
           August 23, 2007


                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge